Harold Roe and Charlotte Roe v. Commissioner.
Roe v. Commissioner
Docket No. 92511.
United States Tax Court
T.C. Memo 1965-100; 1965 Tax Ct. Memo LEXIS 230; 24 T.C.M. (CCH) 528; T.C.M. (RIA) 65100; April 15, 1965
Dale Forbes and Melvyn M. Ryan, for the petitioners. H. Kent Holman, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioners' income tax, as follows: Taxable Year
Amount
1956
$2,093.79
1957
1,832.60
1958
2,551.61 By an Amendment to Answer, the Commissioner determined that there were increased deficiencies, as follows: Taxable Year
Amount
1956
$3,339.06
1957
2,111.53
1958
6,210.24
At the conclusion of the oral testimony at the trial, the Commissioner requested and was granted permission to amend his pleadings to conform to the proof. By an Amendment to Answer as Amended, the Commissioner determined that there were additional increased deficiencies, [1] as follows: Taxable Year
Amount
1956
$2,325.42
1957
785.47
1958
1,314.52 The Commissioner's claim for the increased deficiencies, as *232 well as his claim for the additional increased deficiencies, is made pursuant to section 6214(a) of the Internal Revenue Code of 1954. [2]
The issues for decision are (1) whether distributions received by petitioners during the years in issue with respect to instruments issued by certain cemetery corporations and designated "Certificates of Indebtedness" constitute distributions received upon the exchange for the partial redemption or retirement of said certificates thereby rendering the gains taxable at capital gains rates pursuant to section 1232, or constitute dividend income taxable as ordinary income and (2) whether amounts received by petitioners from certain cemetery corporations during the years in issue resulting from a transaction which took place in 1954 constitute ordinary income, long-term capital gain, or nontaxable receipts. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, *233 is incorporated herein by this reference. Petitioners Harold Roe (hereinafter sometimes referred to as Roe) and Charlotte Roe (hereinafter sometimes referred to as Charlotte) are husband and wife residing in Helena, Montana. They filed their joint income tax returns for the years in issue with the district director of internal revenue, Helena, Montana. Roe, as of the time of trial, had been in the cemetery business for approximately 16 years. Prior to 1953, he was employed by various cemetery corporations as sales manager. In 1953, after having been associated with cemetery corporations in the States of Illinois, Iowa, and North Dakota, he came to Montana and proceeded to organize the following cemetery corporations: Sunset
Memorial
Date of
Place of
Gardens of
Incorporation
Business
Glendive
Nov. 27, 1954
Glendive, Mont.
Great Falls
Feb. 10, 1953
Great Falls, Mont.
Bozeman
July 27, 1955
Bozeman, Mont.
Butte
Jan. 15, 1954
Butte, Mont.
Miles City
June 6, 1953
Miles City, Mont.
Helena
Jan. 14, 1954
Helena, Mont.
Missoula
Feb. 27, 1953
Missoula, Mont. All of said corporations were formed under the Montana laws applicable to commercial *234 and profitable corporations. The business of each corporation was to acquire and operate land to be used exclusively as a cemetery for the burial of the dead and to conduct activities necessary and incidental to the operation of a cemetery. Since its organization, each corporation has been engaged in the business of operating a memorial-type cemetery and a part of such business has included the sale to the public of burial rights and lots and plots located therein. Hereinafter each cemetery corporation will be referred to by the city wherein it is located. The Articles of Incorporation of each of said cemetery corporations provides in part as follows: II. The purposes for which it is formed are to procure and purchase land and lay out the same into lots and blocks with convenient avenues and walks and to sell the lots for the sole use and purpose of burying the dead and to that end it shall have power to: (a) To enclose, improve and embellish its grounds, avenues, and walks and to erect buildings or valults for its use, and to prescribe in its By-Laws rules for the sale, enclosure and ornamentation of the lots and for erecting monuments or gravestones thereon, and to prohibit *235 any use, division, or improvement or ornamentation of any lot which the corporation may deem improper, and to make such new By-Laws and regulations as are required to secure all the appliances, conveniences and benefits of a cemetery, and to receive by gift monies or property in trust for permanent improvement, maintenance and development and care of the property, and to make contracts with those who may become lot owners for the improvement, maintenance, and care of the lots, graves, vaults and tombs. (b) Acquire and manage all real and personal property necessary or proper for the establishment, embellishment, care and management of a cemetery, and sell and convey real or personal property lawfully acquired but not needed for cemetery purposes. (c) Construct and operate thereon a cemetery and other proper means of disposing of the dead; to purchase, acquire, lay out, plat, re-plat, establish, build, construct, dedicate, own, hold, improve, operate and maintain cemeteries and sell, convey, lease, or otherwise dispose of lots, graves and burial spaces therein. (d) To build, construct, erect, own, operate, manage, finance and maintain mausoleums, columbariums, burial crypts, vaults, *236 funeral homes, chapels, memorials and other necessary buildings and make other improvements, for the burial, cremation or care of the remains of the dead, and to sell, lease, grant, convey or otherwise dispose of space therein or the use thereof. (e) To contract with others for the sale of cemetery lots, graves, and burial spaces, burial crypts and mausoleums, and burial spaces therein; memorials, urns, grave markers or any other merchandise applicable to or connected with a cemetery or burial establishment; and likewise contract with others for the construction, erection, building, operating, managing, financing and maintaining mausoleums, columbariums, burial crypts, vaults, funeral homes, chapels and other necessary buildings and improvements connected with the operation of the cemetery, and the burial, cremation or care of the remains of the dead. (f) To buy, sell, manufacture, or otherwise deal in caskets, burial vaults, urns, grave markers or any other merchandise adaptable to or connected with a cemetery or burial establishment. (g) Incidental to its purposes buy, sell, create or otherwise deal in notes, mortgages, conditional sales contracts, open accounts and any other *237 similar evidences of indebtedness not including the discounting of bills and notes or the buying and selling of bills of exchange. (h) To purchase or otherwise acquire, own, hold, mortgage, pledge, sell, assign, transfer or otherwise dispose of any kind of property, real or personal; to borrow and to loan money; to do any other acts facilitating the accomplishment of or the desirable in connection with any of the aforesaid purposes. From the time of incorporation through and including 1956, 1957, and 1958, Roe and Charlotte owned all of the capital stock in the following cemetery corporations: Missoula, Helena, Great Falls, Butte, and Miles City. In each of these five corporations, the total authorized capital stock was $50,000. Of this amount, $1,010 represents the issued and outstanding stock of each corporation during the years in issue. The stock in each case was issued to Roe and Charlotte for services rendered and not for cash or property. From the time of incorporation to and including 1956, 1957, and 1958, Roe and Charlotte owned the majority of the stock of Bozeman and Glendive. The total authorized capital stock for those two corporations was $50,000. During the years *238 in issue, the issued and outstanding capital stock of Bozeman was $3,041. During the years in issue, the issued and outstanding capital stock of Glendive was $3,660. All of the stock issued to Roe and Charlotte in these two corporations was issued in payment of services rendered and not for cash or property. Roe was president of Glendive, Great Falls, Bozeman, Butte, and Missoula during the years in issue. When Roe came to Montana, he immediately began looking for land suitable for use in the cemetery business. During the period from early 1953 to mid-1955, Roe purchased individually seven tracts of land located within the areas where each of the seven corporations was incorporated. During the short time that Roe held title to these tracts of land (in each case less than six months), he did not in any way improve, subdivide, or plat the property. In each case when Roe purchased the tract of land he intended to convey the property to the corporation located within the same area as the property. While Roe was engaged as sales manager for Memorial Gardens Association, a cemetery corporation with headquarters in Kansas City, Missouri, he became acquainted with the use of "Certificates *239 of Indebtedness" in connection with the cemetery business. Roe was aware that the use of these certificates would be beneficial from a tax standpoint and that payments made on the certificates would be taxable as long-term capital gain. Roe discussed the tax aspect of the use of said certificates with an attorney representing Memorial Gardens Association. Roe was informed that the cemetery could acquire the land from him upon the issuance of certificates of indebtedness and that the cemetery would not be obligated to pay for the land until sales of burial lots were made. The amounts paid to the certificate holders would be a fixed percentage of the sales price and as such would be dependent upon the business of the cemetery. Roe decided to use those "Certificates of Indebtedness" in connection with the transfer of land to the seven corporations here involved. After Roe acquired the property near the city of Miles City, he offered to transfer it to Miles City. On June 20, 1953, a meeting of the board of trustees of Miles City was held. The minutes reflect the following: The secretary then presented to the meeting a proposal from Harold Roe and Charlotte Roe, his wife, to sell and *240 convey to the corporation certain property for cemetery purposes, which was in terms as follows: "I hereby propose and offer to sell to Sunset Memorial Gardens of Miles City, Inc., a certain tract of land consisting of approximately twenty acres near the City of Miles City in Custer County, Montana, which tract was acquired by the undersigned from John Barovich and Mary Barovich, his wife, for the sum of $10,000.00, said tract being briefly described as being a portion of Lots three and four of Section Seven, Township Eight North, Range Forty-eight East, M.P.M. "The consideration for such sale shall be twenty percent of the gross sale price of cemetery lots and burial rights sold from said land and any additions thereto and ten percent of the gross sale price of family memorials and gravemarkers. If accepted, the terms of sale are to be formally set forth in a contract to be made for such purpose, with written certificates of indebtedness, in a form to be agreed upon, to be issued to Harold Roe and to such other persons as he may designate in such percentages as may be designated, the same to show the indebtedness of your corporation for the aforementioned payment. /s/ Harold *241 Roe /s/ Charlotte Roe" The secretary having read the foregoing proposal and having reported to the meeting that the above described land was suitable for cemetery purposes, on motion duly made and seconded, the following resolution was unanimously adopted: RESOLVED: That the president and secretary of the corporation be and they hereby are authorized and directed to enter into negotiations for the purpose of purchasing the property described in the foregoing proposal, for cemetery purposes, and to enter into a formal contract for the purchase of the same upon the terms and for the consideration in said proposal set forth, and to procure and execute, on behalf of the corporation, certificates of indebtedness as therein set forth and issue the same to the persons and in the percentages as shall be designated by the said Harold Roe and to do all things necessary or proper to effect the purchase of said land. * * *
On July 15, 1953, Roe and Miles City entered into a Land Purchase and Financing Agreement whereby Roe transferred the land near Miles City to the corporation. The pertinent parts of the agreement are as follows: I. FIRST PARTY [Roe] does hereby assign, set over, *242 and convey to SECOND PARTY [Miles City], all of his right, title and interest in and to the land particularly described in Exhibit "A" attached hereto, and agrees to execute and cause the execution of proper and necessary documents of conveyance so that SECOND PARTY will be vested with title thereto. II. As consideration for said transfer of said land, SECOND PARTY hereby agrees to pay to FIRST PARTY, his heirs and assigns, a sum equal to Twenty (20%) per cent of the gross sale price (as hereinafter defined) of each and every lot, grave space and/or burial right sold by SECOND PARTY, its successors or assigns, from the said property which is the subject of this agreement and which is described in Exhibit "A", attached hereto, and any further additions made thereto, beginning with the date when SECOND PARTY makes the first sale therefrom and continuing until all the lots, grave spaces and burial rights contained in said land, and any additions thereto, are sold. Said percentage of sales shall be due and payable to FIRST PARTY, his heirs, assignees and transferees, Upon sales made for cash, immediately, and Upon sales made on the installment payment plan FIRST PARTY shall be *243 paid Forty (40%) per cent of each installment payment collected and received by SECOND PARTY from each individual respective lot, grave space and/or burial right purchaser after said purchasers have paid Fifty (50%) per cent of their respective total purchase price, until FIRST PARTY has received in full the amount due him hereunder from each such sale. III. In addition to the sums agreed to be paid to FIRST PARTY in paragraph numbered "II" hereinabove, SECOND PARTY further agrees to pay to FIRST PARTY, his heirs, assigns and transferees, a sum equal to Ten (10%) per cent of the gross sale price (as hereinafter defined) of family memorials and individual grave markers, and any items of merchandise, sold in connection with said property, for and during the time when lots, grave spaces and/or burial rights are being sold from said property. Said percentage of sales of memorials and markers sold shall be due and payable to FIRST PARTY Upon sales made for cash, immediately, and Upon sales of said items made on the installment payment plan FIRST PARTY shall be paid Twenty (20%) per cent of each installment payment collected and received by SECOND PARTY from each individual respective *244 purchaser of said items after said purchasers have paid Fifty (50%) per cent of their respective total purchase price, until FIRST PARTY has received in full the amount due him hereunder from each said sale. IV. The "gross sale price" of lots and burial spaces and burial rights on which said percentages of sales provided for herein is to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective lot or grave or burial right purchaser less the sum agreed to be deposited from each sale for perpetual care and maintenance purposes, and also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the lot or grave space or burial right, which premiums, bonuses, et cetera, are used to induce sales. The "gross sale price" of memorials and markers on which the percentage of sales of such items is to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective purchaser, less any sum agreed to be deposited *245 from each such sale for perpetual care and maintenance purposes, also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the memorial or grave marker, which premiums, bonuses, et cetera, are used to induce sales. V. The parties hereto agree that the percentages of sales required hereby to be paid to FIRST PARTY, and the right to receive the same, as set out in paragraphs numbered "II" and "III" hereof, shall be divided into One Hundred (100) equal parts and SECOND PARTY agrees to issue to and deliver to FIRST PARTY registered Certificates of Indebtedness representing such parts, in the denomination as may be requested by FIRST PARTY and the said Certificates of Indebtedness shall be personal property and shall be transferable by the FIRST PARTY, or any registered holder thereof, or their representatives or assigns, only upon the books of the SECOND PARTY upon the surrender of said Certificates of Indebtedness of which such transfer is desired. Each Certificate of Indebtedness, and the registered holder thereof, shall be entitled to the *246 pro rata share of the percentage of sales provided to be paid in paragraphs numbered "II" and "III" herein that the units of interest of each Certificate bears to the total of One Hundred (100) equal parts or units. Each said Certificate of Indebtedness shall be in form and content as shown by a copy attached to this agreement marked Exhibit "B". As in accordance with paragraphs numbered "II" and "III" hereinbefore, payments due hereunder to FIRST PARTY on sales made on the installment payment plan, are to be paid only from collections made from the individual respective purchasers of lots and grave spaces and burial rights and memorials and grave markers, and/or other items of merchandise after said purchasers have paid Fifty (50%) per cent of their contract price, all monies paid on account of any Certificate of Indebtedness will necessarily be derived from the last Fifty (50%) per cent due from said purchasers, except in instances where sales are made for cash. SECOND PARTY agrees that each Certificate of Indebtedness to the extent of its pro rata share shall be and is hereby made a lien upon the last Fifty (50%) per cent of the gross sale price of lots and burial spaces and *247 burial rights and memorials and grave markers, and/or other items of merchandise, paid to SECOND PARTY by the purchasers thereof, to the extent that payment is due therefrom under paragraphs numbered "II" and "III" herein. And the proceeds of said percentages of sales so to be paid, shall constitute the original land purchase fund and obligation of SECOND PARTY. All such Certificates of Indebtedness shall be registered in a book or books kept by SECOND PARTY for that purpose. SECOND PARTY shall keep and maintain true and accurate records of the transfers thereof. Whenever any Certificate is presented duly endorsed for transfer and bears requisite tax stamps SECOND PARTY shall accept such transfer, record the same, and issue new Certificate or Certificates therefor. Any and all amounts of money paid to SECOND PARTY on account of such sales and which shall be due to FIRST PARTY under paragraphs numbered "II" and "III" hereof, shall thereupon be received by SECOND PARTY impressed with a trust as trust funds, and in their original form such payments due FIRST PARTY shall be promptly placed and deposited by SECOND PARTY in a special account kept by SECOND PARTY for that purpose in a *248 bank or trust company satisfactory to FIRST PARTY, which funds shall be known as "Special Trust Fund". These monies shall at no time and under no circumstances be or become SECOND PARTY'S funds or commingled with SECOND PARTY'S other funds, or be or become subject to SECOND PARTY'S jurisdiction or control, except as herein specifically stated and at no time shall any portion thereof be deemed for any purposes SECOND PARTY'S funds or monies. At no time shall such funds or any portion thereof be or become subject to any claims of SECOND PARTY'S creditors. The said percentages of said sales price, accruing to FIRST PARTY, as herein stated, shall be and at all times remain a trust fund or funds payable to FIRST PARTY or to the holders of said Certificates of Indebtedness herein provided for. The funds which shall accumulate in said trust fund shall be paid pro rata to said holders of said Certificates of Indebtedness on the 10th day of November, 1953, and on the 10th day of each month thereafter during the term of this agreement. After all payments shall have been made on all sales contracts entered into during the period of this agreement the obligations of SECOND PARTY in respect to *249 said Certificates of Indebtedness shall terminate and come to an end and the rights of said holders of said Certificates of Indebtedness shall cease and terminate and the Certificates shall be deemed to have been fully retired and satisfied. Pursuant to said agreement, Miles City issued "Registered Certificates of Indebtedness" to Roe. The pertinent parts of said certificate read as follows: This is to certify that HAROLD ROE is entitled to an interest equal to Fifty One Hundredths (50/100ths) in Twenty (20%) per cent of the proceeds represented by the sale price of all lots and grave spaces, and also in Ten (10%) per cent of the proceeds represented by the sale price of memorials and individual grave markers, and any other item of merchandise sold by the undersigned in, from and in connection with Sunset Memorial Gardens of Miles City, a cemetery situate in Custer County, Montana, during the period of time beginning with the date when the undersigned first makes a sale from and in connection with said property, and continuing until all the lots, grave spaces and burial rights contained in said cemetery property and any additions thereto, are sold; all as set forth and in accordance *250 with an agreement between Harold Roe and Sunset Memorial Gardens of Miles City, Inc., dated the 15th day of July, 1953, which said agreement is incorporated herein by reference. Such proceeds from said sales shall constitute the original land purchase and financing fund of Sunset Memorial Gardens of Miles City, Inc., and shall be accumulated only out of the last Fifty (50%) per cent of the sale price paid to the undersigned on each burial space and memorial and marker or other merchandise on account of such sale. Sunset Memorial Gardens of Miles City, Inc., shall be liable to the holder of this Certificate, and this Certificate shall be a lien on such original land purchase and financing fund, to the extent of the interest represented by this Certificate; and the holder of this Certificate shall be entitled to have paid over to him such proportion of said fund as the number of units represented by this Certificate bears to the total number of One Hundred (100) units. Payments on account of this Certificate of Indebtedness shall after November 10, 1953, be made on the 10th day of each month in each year, and shall continue only for such period of time as is necessary to pay out *251 in full the amount accumulated in the original land purchase and financing fund. After all such payments are made, the liability of Sunset Memorial Gardens of Miles City, Inc., under this Certificate of Indebtedness shall terminate and the obligation represented by this Certificate shall be discharged. This Certificate is transferable only on the books of Sunset Memorial Gardens of Miles City, Inc., by the original holder thereof in person or by his attorney, on surrender of this Certificate. * * *
The same procedure was followed by Roe with regard to the other six pieces of property. Before the transfers were made, an offer was submitted to the respective corporations by Roe. The corporations would then hold a meeting of the board of trustees who would in turn accept Roe's proposal and terms. A "Land Purchase and Financing Agreement" would be executed similar in all material respects to the one set forth above. Then the corporations would issue "Certificates of Indebtedness" to Roe similar to the one set forth above. The following table shows the corporations to which the land was transferred, the date of transfer, and cost of the land to Roe: Date of
Corporation
Transfer
Cost
Glendive
Apr. 7, 1955
$ 2,700
Great Falls
Aug. 17, 1953
14,000
Bozeman
Aug. 8, 1955
6,200
Butte
Feb. 15, 1954
2,800
Miles City
July 15, 1953
10,000
Helena
Feb. 16, 1954
15,000
Missoula
Aug. 9, 1953
8,250
*252 The following table shows the members of the board of trustees of six of the corporations at the time the land was transferred: Glendive
Roe, Charlotte, Ervin Larsen
Miles City
Butte
Roe, Charlotte, William S. Peterson
Helena
Great Falls
Roe, Edwin Rath, William S. Peter-
son
Missoula
Roe, Edwin Rath, Harold B. Velline
In accepting the certificates of indebtedness, Roe realized that he was placing his investment (land) at the risks of the business. The return Roe was to receive bore a direct relation to the financial success of the business. The failure of the business meant that his investment might be lost. The land as transferred to the corporations was not in a suitable condition for use as a cemetery. Before the property could be so used, the following improvements were necessary: Building of roads, landscaping, planting of shrubbery, building crypts, constructing underground sprinklers, and installing of religious works of art and other memorials depicting the life of Christ. The cost of these improvements varied, depending upon the size of the land and the number of crypts to be constructed. The smallest amount spent to improve the land was at *253 Glendive where between $40,000 and $50,000 was utilized. The expenses for improvements rose to over $100,000 at Miles City. The money used for improvements came partially from the sales of the cemetery lots but mainly the source was funds provided by various investors, as discussed, infra. On September 2, 1954, a special meeting of the board of directors of Butte was held. The pertinent parts of the minutes are as follows: The Chairman then stated to the meeting that the Company [Butte] needed funds for the purchase of real estate for a cemetery and the operation and development of its cemetery, SUNSET MEMORIAL GARDENS OF BUTTE. He stated that Guido Orlandi, of Kansas City, Missouri, had transferred land to the Company and had advanced funds for the operation and development of the cemetery upon the agreement by the company to pay a percentage of the sales price of all lots, graves, crypts, burial spaces and memorials sold from and in connection with said cemetery for a period of ten years. A form of written Operating Agreement was presented to the meeting, together with other agreements incident thereto, which were read and studied by all of the directors, all of which were *254 signed and delivered by the officers of this corporation on February 16, 1954. After full discussion of the matter, it was decided that it was to the best interests of the company that such Operating Agreement, and agreements incident thereto, were entered into with said Guido Orlandi, and the following resolution was unanimously adopted, to-wit: RESOLUTION RESOLVED, by the Board of Directors of SUNSET MEMORIAL GARDENS OF BUTTE, INC., that the acts of the officers of SUNSET MEMORIAL GARDENS OF BUTTE, INC. in entering into an Operating Agreement dated February 16, 1954, whereby said Guido Orlandi advanced to this company funds for the purchase of real estate for a cemetery and the operation and development of its cemetery, SUNSET MEMORIAL GARDENS OF BUTTE, in consideration of the payment by this Company to said Guido Orlandi, or his assigns, of 10% of the sales price of all lots, graves, crypts and burial spaces and 5% of the sales price of all memorials sold in and from said cemetery, for the period of ten (10) years from the date of the first sale made by this Company from said cemetery, are hereby approved, ratified and adopted as the acts of this corporation. RESOLVED, *255 FURTHER, that the acts of the officers of this corporation in issuing two hundred forty Certificates of Indebtedness for $2,500.00 each to Guido Orlandi, as evidence of its indebtedness to him, and to pay thereon the percentage on each certificate as agreed in said Operating Agreement, be and they are hereby approved, ratified and adopted as the acts of this corporation. RESOLVED FURTHER, that the acts of the officers of this corporation in executing on behalf of this corporation a Mortgage Lien Agreement, filing same of record in Silver Bow County, Montana, as a lien against the cemetery property of this corporation, to be foreclosed by said Guido Orlandi in the event this corporation defaults in the payments to be made said Guido Orlandi, or his assigns, on account of the advancement of such funds, be and they are hereby approved, ratified and adopted as the acts of this corporation. RESOLVED FURTHER that a copy of said contracts and such Certificate of Indebtedness be placed of record in the minute book of this corporation. * * *
Pertinent parts of the "Operating Agreement" entered into on February 16, 1954, between Guido Orlandi and Butte are set forth below: * *256 * *
1. INVESTOR [Guido Orlandi] will convey to THE COMPANY [Butte] an undivided one-half interest in the following described real estate located in the County of Silver Bow, State of Montana, to-wit: Being a part of Section 31, Township 4 North, Range 9 West of the Montana Meridian, and more particularly described as follows: Beginning at an iron pipe on the northerly right-of-way line of U.S. Highway Number 10, said point being North 4degree 47feet East 3836.86 feet from the Southwest Corner of said section, thence North 0degree 21feet East 136.14 feet to a point; thence South 89degree 39feet East 524.28 feet to a point; thence South 8degree 25feet West 205.74 feet to an iron pipe on said right-of-way line; thence North 81degree 53feet West on said right-of-way line 500.0 feet to the place of beginning, and containing 2.0 acres, in the County of Silver Bow, State of Montana; and will advance to THE COMPANY certain funds for the initial development of said property as a cemetery, necessary expense in operating the property and obtaining a sales force for making sales therein, and for the construction of one hundred (100) double garden type crypts. All the terms and provisions *257 of this Operating Agreement shall apply to and be binding upon the parties hereto for the ten (10) year period hereinafter provided, not only with respect to the real estate above described, but also with respect to all real estate hereafter acquired, dedicated, operated and developed as a cemetery by THE COMPANY. THE COMPANY has a land purchase contract for thirteen (13) acres of land adjoining the above described land, which land THE COMPANY will purchase and pay for in accordance with the terms of said purchase contract. 2. In consideration for the said real property and the funds advanced by INVESTOR, THE COMPANY will pay to INVESTOR, a sum equal to 10% of the gross sales price (as hereinafter defined) of each lot, grave, crypt and/or burial space, and 5% of all memorials sold by THE COMPANY from and in connection with the property described above, for and during the period of ten (10) consecutive years after the date when THE COMPANY makes the first said sale therefrom. Said percentage of sales shall be due and payable to INVESTOR, upon be due and payable to INVESTOR, upon sales made for cash, immediately, and upon sales made on the installment payment plan, INVESTOR shall be *258 paid 20% of each installment payment collected and received by THE COMPANY from each individual respective lot, grave, crypt and/or burial space and 10% of each installment payment collected and received from such memorials purchased after said purchasers have paid 50% of their respective total purchase price, until INVESTOR has received in full the amount due him hereunder from each such sale. After all payments shall have been made on all sales contracts entered into prior to the end of the aforesaid ten (10) year period, the obligations of THE COMPANY in respect of Certificates of Indebtedness, hereinafter described, shall terminate and come to an end. The rights of the certificate holders shall thereupon cease and terminate and the certificates then remaining unredeemed shall be delivered up for surrender and cancellation. When the holder of a Certificate of Indebtedness shall have been paid $2,500.00 from such percentage of such sales, such Certificate of Indebtedness shall be surrendered to SUNSET MEMORIAL GARDENS OF BUTTE, INC. A holder of more than one of said certificates of indebtedness shall surrender one such certificate of indebtedness each time he shall have been paid *259 a total of $2,500.00 from such percentage of such sales. Should the payments due hereunder to INVESTOR be more than sufficient to retire all said issued certificates of indebtedness, same shall nevertheless be paid pro rata to the holder or holders of said certificates, respectively, at the times they were paid in full and surrendered. 3. Sums due INVESTOR, in accordance herewith, on sales made during the period of time specified herein, shall be payable from all sales made during said period of time, even though collections and payments thereon are due and made after the termination of said period of time. 4. The "gross sales price" of lots, graves, crypts, burial spaces and/or memorials on which said percentages of sales provided for herein are to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective lots, grave, crypt, burial space and/or memorial purchaser, less $50.00 of the sale price of all crypts and also less the sum agreed to be deposited from each sale for perpetual care and maintenance purposes. 5. The percentages of sales required hereby to be paid to INVESTOR, and the right to receive *260 the same, as set out in paragraph numbered 2, shall be divided into two hundred forty (240) equal parts of $2,500.00 each. THE COMPANY agrees to issue to and deliver to INVESTOR, 240 registered Certificates of Indebtedness of $2,500.00 each, and no more. Said Certificates of Indebtedness shall be personal property and shall be transferable by the INVESTOR, or any registered holder thereof, or their representatives or assigns, upon the books of THE COMPANY upon the surrender of said Certificates of Indebtedness of which such transfer is desired. Each Certificate of Indebtedness, and the registered holder thereof, shall be entitled to 1/240th share of the percentage of sales provided to be paid in paragraph numbered 2 herein. Each such Certificate of Indebtedness shall be in form and content as shown by a copy attached to this agreement marked Exhibit A. All such certificates shall be registered in a book or books kept by THE COMPANY for that purpose. THE COMPANY shall keep and maintain true and accurate records of all transfers thereof. Whenever any certificate is presented duly endorsed for transfer and bearing the requisite transfer tax stamps, THE COMPANY shall accept such transfer, *261 record the same, and issue new Certificate or Certificates therefor. 6. As in accordance with paragraph numbered 2 hereinbefore, payments due hereunder to INVESTOR are to be paid only from collections made from the individual respective purchasers after said purchasers have paid 50% of their contract price. All moneys paid on account of any Certificate of Indebtedness will necessarily be derived from the last 50% due from said purchasers, except in instances where sales are made for cash. Each Certificate of Indebtedness, to the extent of its pro rata share, shall be and is hereby made a lien upon the last 50% of the gross sales price of lots, graves, crypts, burial spaces and/or memorials paid to THE COMPANY by the purchasers thereof, to the extent that payment is due therefrom under paragraph numbered 2 herein. * * *
In accordance with the terms of the agreement, Butte issue to Orlandi certificates of indebtedness, the contents of which are set forth below: This is to certify that… is entitled to an interest equal to one-two-hundred-fortieths (1-240ths) of ten per cent (10%) of the proceeds represented by the sales price of all lots, graves, crypts and/or burial spaces, *262 and five per cent (5%) of all memorials, sold by the undersigned, in, from and in connection with Sunset Memorial Gardens of Butte, a cemetery in Silver Bow County, Montana, near the City of Butte, Montana, during the period of ten (10) years immediately following the date when the undersigned makes the first such sale from said property, all as set forth and in accordance with an agreement between Guido Orlandi, on the one part, and the undersigned on the other part, dated February 16, 1954, which agreement is incorporated herein by reference. Such proceeds from said sales shall be accumulated only out of the last fifty per cent (50%) of the sale price paid in to the undersigned on each lot, grave, crypt, burial space and/or memorial on account of such sale. SUNSET MEMORIAL GARDENS OF BUTTE, INC., shall be liable to the holder of this certificate, and this certificate shall be a lien on such proceeds to the extent of the interest represented by this certificate. The holder of this certificate shall be entitled to have paid over to him 1/240ths of said funds. Payments on account of this certificate of indebtedness shall be made on the 10th day of each month in each year, and shall *263 continue only for such period of time as is necessary to pay out in full the amount due under said agreement. After all such payments are made, the liability of Sunset Memorial Gardens of Butte, Inc., under this Certificate of Indebtedness shall terminate, and the obligation represented by this certificate shall be discharged. This certificate is transferable only on the books of Sunset Memorial Gardens of Butte, Inc., by the registered holder thereof in person or by His attorney, on surrender of this certificate. * * *
Orlandi entered into similar operating agreements with Miles City, Great Falls, Helena, and Missoula. In each case, the board of trustees at special meetings called on September 2, 1954, voted to enter into the operating agreements with Orlandi. Such agreements were executed, and in accordance with such agreements, certificates of indebtedness were issued. The agreements entered into with Orlandi were different from the agreements he entered into with Butte in only one major respect. Orlandi's agreements with the four corporations were only for the advancement of money and not also for the transfer of land. In all, Orlandi advanced over $100,000 to the five *264 corporations with each of which he had entered into an "Operating Agreement," the money being used to develop and improve the land for cemetery uses. Some of the corporations here involved found it necessary to make additional arrangements for funds, needed for development, besides the agreement with Orlandi. John D. North (hereinafter referred to as North) extended his credit to some of the corporations to the extent of $30,000. First the board of directors, at a special meeting, would resolve that it would be to their advantage to obtain additional funds. Portions of the minutes of such a meeting held by Missoula appear below. The Secretary reported to the meeting that John North, of Billings, Montana, had offered to make a loan to the corporation of money to be used for further development of cemetery properties, and to enable other corporations now or in the future to be formed in the state to have operating capital for the purpose of establishing cemeteries in other cities of Montana. A general discussion was had on the matter, and the meeting having concluded that such a loan was desirable, on motion duly made and seconded, the following resolution was unanimously adopted: *265 RESOLVED: That the President or Vice-president of this corporation, together with the Secretary thereof, be and they hereby are authorized and directed to procure from John North, of Billings, Montana, a loan of money in such amount as in their discretion may seem necessary or proper and upon such terms as they may see fit, and to provide for the repayment of such loan out of the sale of cemetery lots and such other property as may be now or hereafter owned by the corporation, and to further provide for the payment to said John North of such percentage of such sales, in addition to the repayment of said loan, as they shall deem proper, and to sign, execute and deliver, on behalf of the corporation, such contracts, agreements and instruments as shall be, in their discretion, proper for such purpose. Then an "Agreement" would be entered into between North and the corporation receiving the funds, whereby the former would be issued certificates of indebtedness. Portions of the agreement between North and Helena appear below: * * *
WHEREAS, FIRST PARTY [North] has advanced the sum of Twenty-Five Hundred ($2500.00) Dollars to SECOND PARTY [Helena] toward and being a part of *266 the original financing of the organization and business of SECOND PARTY, and for original funds for its general purpose, the receipt of which from FIRST PARTY SECOND PARTY hereby acknowledges, for which SECOND PARTY acknowledges itself to be indebted to FIRST PARTY, and for payment of which indebtedness FIRST PARTY has agreed to accept payment in the manner hereinafter provided, NOW, THEREFORE, It is Agreed as Follows: I. SECOND PARTY hereby acknowledges itself to be indebted to FIRST PARTY, to the extent, and for payment of money, hereinafter provided for and required to be paid to SECOND PARTY, and FIRST PARTY agrees to accept in full satisfaction of said indebtedness, the said payments of money hereinafter provided to be paid by SECOND PARTY to FIRST PARTY, in the manner, from the source, and at the times provided for herein. II. In order to satisfy said indebtedness to FIRST PARTY, SECOND PARTY agrees to pay to FIRST PARTY a sum equal to Two and One-Half (2 1/2%) per cent of the gross sale price (as hereinafter defined) of each lot, grave, crypt, Garden Memorial Crypt, and/or burial space sold by SECOND PARTY from said cemetery property, begining at the time when the first *267 such sale is made, and continuing for the period of the next consecutive ten (10) years thereafter; and in addition thereto to pay to FIRST PARTY a sum equal to One (1%) per cent of the said gross sale price of each said lot, grave, crypt, Garden Memorial Crypt, and/or grave space, memorial, grave marker, and/or other item of merchandise sold in and in connection with said cemetery property, said payment of said sums equal to said One (1%) per cent of said sales to begin on the day and year when said ten (10) year period ends and to continue thereafter until the last grave space is sold from said cemetery property. Said percentages of each said sale shall be due and payable to FIRST PARTY and shall be paid to him upon cash sales, immediately; and upon sales made upon the installment payment plan said Two and One-Half (2 1/2%) per cent and said One (1%) per cent, respectively, of each said sale shall be paid to FIRST PARTY by SECOND PARTY paying to him Five (5%) per cent or Two (2%) per cent, respectively, of each installment payment collected and received by SECOND PARTY from each individual respective purchaser of such items after said purchaser has paid Fifty (50%) per cent of *268 his total contract price, until FIRST PARTY shall have received the total sum due him from each such sale. III. Sums due FIRST PARTY in accordance herewith, on sales made during the period of time specified herein shall be payable from all sales made during said period of time, even though collections and payments thereon are due and made after the termination of said period of time. IV. The "gross sale price" of lots and/or burial spaces on which said percentages of sales provided for herein are to be computed shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual lot or grave space purchaser, less the sum agreed to be deposited from each sale for the perpetual care and maintenance purposes, and also less any service or carrying charge. In the instance of the sale of all "crypts" and especially on the sale of "Garden Memorial Crypts" the "gross sale price" upon which said percentage of sales provided for herein are to be computed shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual purchaser of said crypts, less the sum of Fifty ($50.00) Dollars per crypt space and *269 less the sum agreed to be deposited from each such sale for the perpetual care and maintenance purposes, and also less any service or carrying charge. "Garden Memorial Crypts" herein referred to are designed for two (2) interments, one above the other, in a single grave space, and said deduction of said Fifty ($50.00) Dollars is to be made from the sale of each single crypt space, one above the other, covering one grave space in the cemetery property, or a total of One Hundred ($100.00) Dollars for a crypt designed for the interment of two (2) bodies. V. The percentages of sales required hereby to be paid to FIRST PARTY, and the right to receive the same, as set out in paragraph numbered "II" hereof, shall be divided into One Hundred (100) equal parts and SECOND PARTY agrees to issue to and deliver to FIRST PARTY registered Certificates of Indebtedness representing such parts in denominations as may be requested by FIRST PARTY, and said Certificates of Indebtedness shall be personal property and shall be transferable by FIRST PARTY, or any registered holder thereof, or their representatives or assigns, upon the books of SECOND PARTY upon the surrender of the said Certificate of Indebtedness *270 of which such transfer is desired. Each Certificate of Indebtedness, and the registered holder thereof, shall be entitled to the pro rata share of the percentages of sales provided to be paid in paragraph numbered "II" herein that the units of interest of each Certificate bears to the total of One Hundred (100) equal parts or units. * * *
The certificates of indebtedness issued to North were in all respects identical to the certificates issued to Orlandi, which were set forth earlier. In addition to the advances received by the above-mentioned corporations from Orlandi and North, the corporations obtained additional funds from M. McGuon. The sum of $25,000 was made available by him for use by the various corporations for the development and improvement of the land. Roe was also a stockholder in another Montana cemetery corporation known as Sunset Memorial Gardens of Billings, Inc. (hereinafter referred to as Billings). As of September 4, 1954, Billings had advanced for development purposes, the following amounts to the listed corporations: Corporation
Amount Borrowed
Helena
$41,724.02
Great Falls
13,563.22
Butte
21,246.52
Missoula
6,489.21
Miles City
14,400.13
*271 The following table reflects the issued and outstanding capital stock of the listed corporations, together with the total liabilities of said corporations as of December 31, 1954: Corporation
Capital Stock [1]
Liabilities
Miles City
$ 510
$33,144.82
Butte
510
52,650.94
Great Falls
510
70,453.00
Missoula
510
38,278.16
Glendive
1,500
7,800.00
The seven corporations here involved sold grave spaces, memorial markers, and other merchandise during the years 1956, 1957, and 1958. Under the terms of the "Land Purchase and Financing Agreements" and documents entitled "Registered Certificates of Indebtedness" Roe received the following payments in the years indicated: Corporation
1956
1957
1958
Missoula
$ 4,593.87
$ 5,477.75
$ 993.70
Helena
992.01
Butte
4,306.60
3,089.50
6,759.93
Miles City
871.52
1,318.20
1,796.85
Bozeman
740.00
1,000.00
Glendive
7,125.74
11,822.89
Great Falls
5,588.84
7,048.04
2,888.95
Total
$23,226.57
$17,925.50
$25,262.32 The payments made by the corporations on the certificates of indebtedness were treated *272 as a cost of land purchased, and as such were deducted by them in arriving at their gross profit as a cost of sales. In reporting the above payments for income tax purposes, Roe included only the amounts which exceeded his cost basis in the certificates. The following table reflects the amounts Roe reported on his returns for the years in issue: Corporation
1956
1957
1958
Missoula
$ 2,374.57
$ 5,477.75
$ 993.70
Butte
2,385.60
3,089.50
6,759.93
Glendive
7,125.74
11,822.89
Great Falls
5,588.84
7,048.04
2,888.95
$17,474.75
$15,615.29
$22,465.47
50% taken
into account
per returns
filed
$ 8,737.38
$ 7,807.65
$11,232.74 The foregoing sums were reported as longterm capital gain by Roe and Charlotte. In every case all payments in issue for the years 1956, 1957, and 1958 were made not less than six months after the documents entitled "Registered Certificates of Indebtedness" were issued. None of the above-named cemetery corporations has ever paid or declared any formal cash dividends during the years 1953 through 1958, inclusive. All documents were drawn and all documents entitled "Registered Certificates of Indebtedness" were drawn *273 and issued by the aforenamed cemetery corporations for the purpose of meeting the requirements of section 117(f) of the Internal Revenue Code of 1939, reenacted as section 1232 of the Internal Revenue Code of 1954. In his deficiency notices, the Commissioner determined that the amounts received by Roe as the owner of the certificates of indebtedness constituted ordinary income. However, in so doing, the Commissioner allowed Roe to recover his costs in said certificates. After the trial of the case, respondent moved and was granted permission to amend his answer so as to conform his pleadings to the proof. In his Amendment to Answer as Amended, respondent now has determined that all amounts received on the certificates of indebtedness constitute ordinary income. Billings, another Montana corporation referred to previously, was organized in 1952 by Edwin Rath (hereinafter referred to as Rath), William Peterson (hereinafter referred to as Peterson), and Roe. The purpose of the corporation was to operate a cemetery in Billings, Montana. The stock ownership was 50 shares for Roe, 50 shares for Rath, and 2 shares for Peterson. Roe and Rath conveyed land to the *274 corporation on the same basis that Roe did with the other seven corporations previously discussed. Roe and Rath each received certificates of indebtedness. The certificates gave Roe and Rath the right to receive certain percentages of the gross income of the corporation. Billings made various loans to Missoula, Butte, Miles City, Helena, and Great Falls, the entire stock of which was owned by petitioners. On September 4, 1954, an agreement was entered into by Roe, Rath and Billings. The pertinent part of said agreement appears below: This Agreement made and entered into this 4th day of September 1954 by and between Harold Roe Party of the first part and Sunset Memorial Gardens of Billings, Inc., and Edwin Rath, Parties of the second part, it is hereby agreed by both parties that in consideration of Harold Roe signing his Certificate of Indebtedness in the Sunset Memorial Gardens of Billings, Inc., and signing all stock certificates that he owns in said company, to Edwin Rath, that Sunset Memorial Gardens of Billings, Inc., will cancel any and all indebtedness as of this date owing them by Harold Roe or Sunset Memorial Gardens of Great Falls, Inc., Sunset Memorial Gardens of Missoula, *275 Inc., Sunset Memorial Gardens of Helena, Inc., Sunset Memorial Gardens of Butte, Inc., Sunset Memorial Gardens of Miles City, Inc. Certificates of Indebtedness consists of 500/1000ths Units. Harold Roe hereby agrees to assign to Edwin Rath, his right and title to 2 1/2 Acres of land purchased from C & M Construction Company. Edwin Rath is to make all payments on this land. Edwin Rath acknowledges receipt of half of note in the amount of $11,000.00 in favor of Reuben Rath and assumes responsibility for payment thereof. The 1954 Eldorado Cadillac is the property of Harold Roe. Pursuant to the agreement, Roe assigned to Rath all his stock in Billings and all his certificates of indebtedness of the corporation, and his one-half interest in 2 1/2 acres of land. In consideration for this assignment and as a part of said agreement, Roe received a Cadillac automobile. Rath assumed liability on an $11,000 note payable to Reuben Rath, and Billings cancelled all indebtedness owing to it by Roe or Great Falls, Missoula, Helena, Butte and Miles City. On September 30, 1954, the board of trustees of Helena, Missoula, Miles City, Butte, and Great Falls held special meetings. The pertinent *276 parts of the minutes of said meeting of Helena are set forth below: * * *
Mr. Roe reported that as was known to the Board of Trustees the corporation had received advances of money from Sunset Memorial Gardens of Billings, Inc. for its corporate purposes and that recently and on the 4th day of September, 1954, Sunset Memorial Gardens of Billings, Inc. had demanded that some arrangement be made for the repayment of said advances which as shown by an audit was in the amount of $41,724.02. Mr. Roe further reported that after some negotiations Sunset Memorial Gardens of Billings, Inc. had agreed to accept in full satisfaction and release of said obligation for said advance of money personal assets of his consisting of the shares of stock owned by him in said company and Certificates of Indebtedness issued by said corporation and that he being willing to exchange said assets for the obligation of Sunset Memorial Gardens of Helena, Inc. to repay him therefor, he had consummated such arrangement and had paid said debt for the company. Whereupon, Mr. Roe moved the adoption of the following resolution: BE IT RESOLVED that Sunset Memorial Gardens of Helena, Inc. does hereby recognize *277 that Harold Roe has exchanged his personal assets consisting of shares of stock owned in and Certificates of Indebtedness issued by Sunset Memorial Gardens of Billings, Inc. for the obligation of the corporation to said company for and in the amount of $41,724.02, and that this company shall remain and stand obligated to repay said obligation in said sum to Harold Roe instead of to Sunset Memorial Gardens of Billings, Inc., arrangements for the liquidation thereof to be made by mutual agreement between Mr. Roe and the company. Said resolution being brought before the meeting by proper action was unanimously adopted. * * *
A similar resolution was made and passed by each of the aforestated corporations. The only difference was in the amount of money borrowed from Billings. A table showing the amount owed by each corporation to Billings as of September 4, 1954, is set forth at page 28, supra, of this opinion. Shortly after said agreement was executed, Roe caused the corporations to debit the payables to Billings and credit new accounts payable or contracts payable in the name of Roe. Roe and Charlotte did not report the above transaction on their 1954 Federal income tax return *278 with the exception of the Cadillac automobile, the latter being reported as additional compensation. During the years 1956, 1957, and 1958 Roe received the following amounts from the corporations on the accounts payable: Corporation
1956
1957
1958
Butte
$ 8,599.05
$ 3,099.05
$ 6,759.93
Miles City
1,025.70
1,389.35
Helena
1,916.05
3,010.73
9,256.55
Total
$10,515.10
$ 7,135.48
$17,405.83
Prior to receiving the payments in 1956, 1957, and 1958, Roe had recovered his basis in the assets he transferred under the September 4, 1954, agreement. Petitioners did not report on their 1956, 1957, and 1958 Federal income tax returns the above payments. Respondent, by an Amendment to Answer filed at the trial of this case, has determined that the aforestated payments received by Roe during the years in issue constitute ordinary income. Opinion Issue 1 Petitioners contend that the excess of the payments received, with respect to their certificates of indebtedness, over their cost basis is taxable as long-term capital gain under the provisions of section 1232. [3] Petitioners argue that there was a bona fide sale of land to the corporations here *279 involved; that in consideration for the land petitioners received registered certificates of indebtedness which did not have a determinable fair market value at the date of issue; that a debtor-creditor relationship was created so that the payment received by them on their certificates first is applied against their basis and any excess payment over the basis represents capital gain. Respondent, on the other hand, takes the position *280 that the conveyance of the land and the issuance of the certificates of indebtedness were part of a nontaxable transaction covered by the provisions of section 351. [4] Respondent maintains that a bona fide debtor-creditor relationship never was intended to be created nor was one in fact created; that the certificates of indebtedness are in reality equity instruments and that the payments received by petitioners during the years in issue represent dividends. Respondent points to the instruments themselves as a clear indication that they are not "debtor instruments" in that they neither provide for the unconditional payment of any fixed sum nor do they provide for interest. We agree with respondent. *281 Petitioners, in their returns for the years in issue, reported the amounts received on the certificates of indebtedness in excess of their basis as capital gains. Respondent, in the notice of deficiency, determined that such amounts constituted ordinary income. At the trial of this case, petitioners made claim that respondent's theory of the case has changed from the position taken in the statutory notice. Petitioners assert that respondent made his original determination on the theory that the certificates of indebtedness were not capital assets. [5] Petitioners now say that respondent is contending that the payments received are dividends because the certificates are in reality equity instruments. Because of this, petitioners argue that the burden of proof is on respondent. With this we cannot agree. The issue we must decide is whether the amounts received are ordinary income or capital gains. As to this issue, the burden of proof is clearly on petitioners regardless of the fact that respondent's theory on the case may have changed. Respondent made his theory of the case abundantly clear in his opening statement. By claiming that the payments received are ordinary income because *282 they are dividends is not inconsistent with his original determination. Estate of Grace M. Scharf, 38 T.C. 15, 27 (1962), affd. 316 F. 2d 625, 630 (C.A. 7, 1963). However, as regards the amendment to respondent's amended answer whereby he asserts an increased deficiency, the burden of proof is clearly on respondent. Rule 32, Tax Court Rules of Practice; Hollywood Baseball Association, 42 T.C. 234, 264 (1964). *283 We turn our attention now to the question whether or not the certificates of indebtedness received by petitioners on the transfer of land to the corporations here involved constitute for tax purposes valid debt instruments. In deciding this question, we are concerned with whether the transfer of land constitutes as a matter of practical reality an equity investment in the business of the various corporations to which the land was transferred, J. A. Maurer, Inc., 30 T.C. 1273, 1289 (1958), so that the certificates of indebtedness were in reality equity instruments. Burr Oaks Corporation, 43 T.C. 635 (Feb. 11, 1965). This very issue has recently been decided by this Court in two separate opinions on facts almost identical with those herein. In Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964), on appeal (C.A. 7, Aug. 10, 1964), and Gardens of Faith, Inc., T.C. Memo. 1964-178, affd. 345 F. 2d 180 (C.A. 4, 1965), this Court found the certificates of indebtedness used therein were not true debt instruments but were instruments evidencing a proprietary equity interest in the nature of preferred stock. Nothing further *284 could be accomplished by our restating the reason for reaching such a conclusion. The petitioners herein have advanced no new arguments or theories which have not already been discussed and rejected by this Court in Sherwood Memorial Gardens, Inc., and Gardens of Faith, Inc., both supra. Accordingly, on the authority of Gardens of Faith, Inc. and Sherwood Memorial Gardens, Inc., we conclude that the certificates of indebtedness were neither in form nor in substance true debt instruments; that a debtor-creditor relationship was never intended to be established, and thus the payments made by the corporations here involved during the years in issue are properly to be included in full in the gross income of petitioners as dividends received to the extent of the respective corporations' earnings and profits. [6]
The recent case of Taft v. Commissioner, 314 F. 2d 620 (C.A. 9, 1963), reversing on this issue a Memorandum Opinion of this Court, relied upon by petitioners is clearly distinguishable on its facts from the instant case. In the cited case, *285 the certificate evidencing the indebtedness was a "promissory note" which the taxpayer had a right to enforce and the obligation to pay was positive and unconditional. Furthermore, the payment of the note was not contingent upon earnings. In the instant case, the certificates are not perfect debt instruments. They do not provide for the unconditional payment of a fixed sum in a definite period of time. There is no interest provided for and there is no way of determining, from the face of the instrument, what the total obligations of the corporations are. Sherwood Memorial Gardens, Inc. and Gardens of Faith, Inc., both supra. Issue 2 By an amendment to answer filed at the trial of this case, respondent has determined that certain payments received by petitioners during the years in issue constitute ordinary income. The payments received stem from a transaction that occurred in September 1954, a year not before this Court. The parties do not disagree as to the facts giving rise to the payments but they do disagree as to the tax consequences stemming from such payments. Petitioners argue that the year 1954 is now closed by virtue of the running of the statute of limitations, as *286 set forth in section 6501(a). [7] Therefore, the Commissioner cannot circumvent the effect of the statute of limitations by asserting that the payments received by petitioners are ordinary income in the years received (1956, 1957, and 1958), when the payments stem from a transaction which occurred in a year closed by the statute of limitations. Petitioners now recognize that the 1954 transaction was a taxable event, which they did not treat as such. However, since the Commissioner is not claiming fraud with regard to the year 1954 and has made no determination with regard to that year, petitioners contend the respondent cannot now do indirectly by taxing the receipt of monies in 1956, 1957, and 1958 what he could not do directly. Lastly, petitioners claim that the burden of proof is on respondent and that he has failed to meet his burden. *287 Respondent, recognizing that he has the burden of proof, maintains that he is seeking to tax the receipt of money by petitioners during the years in issue and not trying to tax the 1954 transaction. Respondent argues that the 1954 transaction was a taxable event which could have been handled three ways, each way giving a different taxable consequence to the monies received in 1956, 1957, and 1958. (1) If the value of what petitioners received in 1954 was equal to the basis of the asset which was given up, there would be no gain or loss in 1954 and all the payments received in 1956, 1957, and 1958 would be taxable as ordinary income. This is respondent's principal contention, relying heavily upon Chamberlin v. Commissioner, 286 F. 2d 850 (C.A. 7, 1961), affirming, 32 T.C. 1098 (1959). (2) If the assets which petitioners received in 1954 had no determinable value, then petitioners would be entitled to first recover their basis and then all payments in excess of their basis would result in capital gains. This result is based on such cases as Burnet v. Logan, 283 U.S. 404 (1931), and Westover v. Smith, 173 F. 2d 90 (C.A. 9, 1949). Although *288 respondent recognizes this as a possible result, he is of the opinion that the better reasoning appears to be his first position. (3) If the value of what petitioners received in 1954 was equal to their face amount, then all the payments in 1956, 1957, and 1958 would be nontaxable. Respondent discounts this theory rather quickly by assuming that if this were the situation petitioners would have reported a gain in 1954 equal to the difference between their basis in the assets transferred and the value of the asset received. Since petitioners did not report any gain in 1954 this, says respondent, could not have been the situation. While we agree with petitioners on this issue, it is not because of their contention that the statute of limitations being closed with regard to the year 1954 precludes the respondent's action with regard to the years in issue. It is clear that while the statute of limitations may bar the assertion of a deficiency for the year 1954, we still have payments being made in the years before this Court. It is the tax consequences of these payments which are in issue. This Court can properly consider facts and transactions of other years as may be necessary and *289 relevant to a proper determination of a deficiency for the years properly before it. State Farming Co., 40 T.C. 774, 782 (1963); W. M. Ritter Lumber Co., 30 B.T.A. 231, 277 (1934); section 6214(b).[8]
However, we agree with petitioners on this issue because respondent having the burden of proof, see Rule 32, Rules of Practice, Tax Court of the United States, has failed to sustain his burden. Respondent has given us three possible theories, set forth above, each resulting in a different tax consequence for handling the payments received in 1956, 1957, and 1958. Respondent then states on brief: The better reasoning appears to be that the accounts had a fair market value equal to the *290 basis of the assets petitioner transferred and therefore petitioner reported nothing. In later years as the collections came in they are taxable as ordinary income. This approach, as well as the other two discussed by respondent, depends upon the fair market value of the property received by petitioners as part of the 1954 transaction. Once the fair market value is determined, then it is easy to see which of respondent's theories applies. However, a prerequisite to the application of any theory is the fair market value of the property received. The burden of showing the fair market value of this property is squarely on respondent. Respondent's answer to this inquiry is stated accurately in his reply brief. There is no evidence in the record concerning the fair market value of the accounts receivable as of September 1954, which were set up on the books of the various cemetery corporations in favor of Harold Roe. * * * We agree that the record before us does not contain any evidence regarding the value of the accounts receivable that petitioners received as part of the 1954 transaction. To review the evidence of record, we know that Billings lent money to five corporations, whose *291 stock was owned 100 percent by Roe. We know the amounts of the loan as of September 1954. However, this is all we know. We do not have any evidence in the record regarding the financial condition of the debtor corporations, such as balance sheets or profit or loss statements for the year 1954 or even 1955. We do not know if any prior loans have been paid when due, nor do we know the terms of the various loans. In short, we do not have any evidence which would enable us to determine, without basing our decision on mere assumptions and/or theories, what the fair market value of these accounts was. "Theories" and "better reasoning" are not valid substitutes for evidence. Accordingly, we must decide this issue for petitioners. Decision will be entered under Rule 50. Footnotes
1. The total deficiencies thus determined by the Commissioner for the taxable years 1956, 1957, and 1958 amounted to $7,758.27, $4,729.60, and $10,076.37, respectively. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
1. In each case, the stock was issued for services rendered by Roe.↩
3. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954.)↩
4. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.↩
5. For purposes of this argument, we will assume that petitioners' statement as to what respondent's theory of the case was at the time of the issuance of the statutory notice is accurately stated. We do this because the record fails to contain a copy of the "Statement" which usually accompanies the "90 day letter." Petitioners attached to their petition as Exhibit A the actual 90-day letter, Form L-21A. The "statement" which was attached to the Form L-21A and which might have disclosed the respondent's reason for determining that the payments received were ordinary income was not offered as an exhibit to the petition, nor was it offered as an exhibit at the trial of the case. It is difficult for us to see how petitioners can make any claim that respondent's theory of the case has materially deviated from the position stated in the notice of deficiency when petitioners have failed to introduce in evidence the "statement" of respondent's position.↩
6. The computations of the earnings and profits of the seven corporations here involved can be accomplished under Rule 50.↩
7. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.↩
8. SEC. 6214. DETERMINATIONS BY TAX COURT. (b) Jurisdiction Over Other Years. - The Tax Court in redetermining a deficiency of income tax for any taxable year or of gift tax for any calendar year shall consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid.↩